**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

KIMBERLY HOLBROOK,                         :

                                              Case No. 3:10-cv-333

                   Plaintiff,

                                              District Judge Walter Herbert Rice
                                              Magistrate Judge Michael R. Merz

   -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                   Defendant.               :

## REPORT AND RECOMMENDATIONS

       Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

       Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial

gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD on May 1, 1996, alleging disability from November 16, 1995, due to degenerative joint disease of the right hip. *See* Tr. 42. On December 11, 1997, following an administrative hearing, the Commissioner awarded Plaintiff a closed period of disability with disability beginning on November 16, 1995, and ending on March 27, 1997. (Tr. 42-47).

Plaintiff again filed an application for SSD on February 12, 2001, alleging disability from February 2, 2001, due to hip problems, chronic fatigue syndrome, and depression. *See* Tr. 78-80; 91. The Commissioner denied Plaintiff's application at the initial level and Plaintiff did not appeal the Commissioner's denial. *See* Tr. 52-55.

Plaintiff protectively filed her current application for SSD on October 19, 2004,

alleging disability from January 10, 2001, due to right hip replacement, lupus, chronic fatigue, and depression. (Tr. 81- 83; 120). The Commissioner denied Plaintiff's initially and on reconsideration. *See* Tr. 56-62. Administrative Law Judge James I.K. Knapp held two hearings, (Tr. 481-506, 507-30), and subsequently determined that Plaintiff is not disabled. (Tr. 18-31). The Appeals Council denied Plaintiff's request for review, (Tr. 6-8), and Judge Knapp's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Knapp found that she met the insured status requirements of the Act through December 31, 2005. (Tr. 20, ¶ 1). Judge Knapp also found that Plaintiff has severe dominant right hip replacement surgery residuals, exogenous obesity, skin lesions possibly secondary to presumptive Sweet's syndrome, and dysthymia, but that she does not have an impairment or combination of impairments that meets or equals the Listings. *Id.* ¶ 3, Tr. 25, ¶ 4. Judge Knapp found further that Plaintiff has the residual functional capacity to perform a limited range of sedentary work. (Tr. 26, ¶ 5). Judge Knapp then used section 201.21 of the Grid as a framework for deciding, coupled with a vocational expert's testimony, and found there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 30, ¶ 10). Judge Knapp concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act at any time from January 10, 2001, through December 31, 2005, the date last insured. (Tr. 31, ¶ 11).

In her Statement of Errors, Plaintiff does not challenge the Commissioner's findings with respect to her alleged mental impairments. (Doc. 9). Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged exertional impairments.

Plaintiff originally fractured her right hip at the age of 13. (Tr. 252). Subsequently,

Plaintiff underwent a total hip replacement in 1992, with revisions in 1995 and 1996. (Tr. 220, 486).

The record contains Plaintiff's treatment notes from the Ohio Institute of Pain Medicine dated from July 1997 to December 2008 where Plaintiff received treatment for chronic pain related to degenerative joint disease treated with total hip replacement. (Tr. 221-53). Plaintiff participated in the Institute's interdisciplinary med-check program. *Id.*

The record contains a copy of Plaintiff's treatment notes from Joint Implant Surgeons, Inc., dated August 6, 1996, to October 6, 2000. (Tr. 188-220). Those records reveal that the physicians at that facility performed Plaintiff's surgery and subsequently monitored her pain medications. *Id.*

Examining physician, Dr. Padamadan, noted on June 22, 2001, that Plaintiff's complaints included right hip pain, depression, and chronic fatigue, and that she reported that sometimes her right leg gave way and she fell. (Tr. 261-69). Dr. Padamadan also noted that Plaintiff had a cane, but carried it in her left hand, was able to walk on her heels and toes without limping, had difficulty arising from a squat suggesting some weakness of the extensor muscles of her hip. *Id.* Dr. Padamadan reported that the mobility in Plaintiff's hip was satisfactory with very minimal restriction of motion, she was able to walk without the cane, she had four plaques on the right and left forearms, compatible with a fungal infection versus early lupus, and that she had good range of motion in her upper extremities and normal grip strength. *Id.* Dr. Padamadan opined that Plaintiff's subjectivity of symptoms was 8/10 and her objective severity of symptoms was 0-1/10 and that her overall functional impairment was, at most, mild. *Id.*

On August 2, 2001, treating dermatologist Dr. Conte reported that Plaintiff had seven large plaques on her bilateral arms and hands and a biopsy confirmed a lymphocytic inflammation

consistent with a collagen vascular disorder. (Tr. 295).  On August 24, 2001, Dr. Conte reported that Plaintiff had new lesions on her left shoulder and one on the right medial thigh. and he identified Plaintiff's diagnosis as clinical inflammatory morphea. *Id.*

The record contains Plaintiff's treatment notes from primary care physician Dr. Guirnalda dated July 2001 to December 2002. (Tr. 300-07).  Those notes reveal that Plaintiff received treatment from Dr. Guirnalda for various medical conditions including bronchitis, depression, hip pain, rashes on her hands and face, GERD, and arthritis of the right hip.  *Id.*

Plaintiff consulted with Dr. Russo at the Pain Clinic at Dayton Outpatient Center in April 2002.  Dr. Russo noted that Plaintiff reported chronic right hip pain with some radiation down the lateral aspect of the leg to the knee. (Tr. 393-94).  He also noted that Plaintiff exhibited right sacroiliitis and severe pain over the lumbar facet joints and moderate tightness and tenderness to palpation in the lumbar paraspinal muscles on the right. *Id.*  Dr. Russo reported that Plaintiff had advanced degenerative joint disease of the right hip, multiple surgeries and chronic pain, possible right sacroiliitis, degenerative disk disease, and/or spondylosis of the lumbar spine. *Id.*  Dr. Russo performed bilateral sacroiliac joint injections, but reported they did not benefit her. (Tr. 386-87). Dr. Russo prescribed Oxycontin in December 2002. (Tr. 383).

In May, 2002, Plaintiff began seeing Dr. Russo's partner, Dr. Gupta. (Tr. 392). On several occasions, Plaintiff presented with skin lesions. (Tr. 384, 385, 388). Plaintiff reported that she got 50% to 80% relief with the pain medications. (Tr. 384-86, 388, 390-92). Dr. Gupta treated Plaintiff with medication, physical therapy, and injections. (Tr. 384, 385).  Treatment notes from 2003 reveal that Plaintiff received some relief from the medications. (Tr. 374-82).

Plaintiff consulted with internist Dr. Correia of the Cleveland Clinic for further

evaluation of her skin lesions in October 2002. (Tr. 316-18). Dr. Correia noted that Plaintiff reported the lesions were primarily on her arms, but she had also had lesions on her legs and her lower eyelid and that the lesions were initially solid raised plaques that eventually crusted over, peeled and resolved with the process lasting about one to two weeks. *Id.* Dr. Correia also noted that examination revealed a large lesion on Plaintiff's right forearm and a smaller lesion at her first metacarpal, she had swelling and decreased range of motion in the fingers, that the skin lesions were not typical of lupus, but that he could not make a definitive diagnosis. *Id.* A biopsy performed in December 2002 was "best interpreted as leukocytoclastic vasculitis." (Tr. 314-15).

In April 2003 Plaintiff consulted with rheumatologist Dr. Orlowski of the Cleveland Clinic who noted that Plaintiff had a malar rash across her cheeks. (Tr. 309-10). Dr. Orlowski also noted that Plaintiff also reported significant fatigue. *Id.* Dr. Orlowski reported that Plaintiff had multiple lesions in various stages of healing predominantly on the distal forearms, her lower extremities showed a mild erythematosus hue in malar distribution, and that her musculoskeletal examination was normal. *Id.* Dr. Orlowski opined that the most likely diagnosis was LCV (leukocytoclastic vasculitis), as suggested by the biopsy. *Id.*

Plaintiff treated with rheumatologist Dr. Stevens from June 2004 to January 2005. (Tr. 319-30). In June, 2004, Dr. Stevens found no malar rash, although he noted a "sort of bruisy rash on her arms." *Id*. Dr. Stevens reported that an autoimmune problem should be ruled out and in August 2004 Dr. Stevens noted lesions on Plaintiff's arms, which he noted were likely related to lupus. (Tr. 321A.). Dr. Stevens prescribed medications and in September, 2004, Plaintiff reported that her rash was better but she felt fatigued. *Id.*

Dr. Padamadan examined Plaintiff again in February 2005 and noted that Plaintiff

7

walked with a cane in her right hand, which was "the wrong side of the recommended use of the cane." (Tr. 331-39). Dr. Padamadan also noted that Plaintiff exhibited erythematosus skin areas on both her cheeks and faded hyperpigmentation on her forearm without scarring. *Id.* Dr. Padamadan reported that Plaintiff had limited external rotation of her right hip, normal range of motion in her elbows, wrists, and fingers, normal internal and external rotation of her shoulders, no sensory abnormalities in her lower extremities, and that her knees were unremarkable. *Id.* Dr. Padamadan opined that Plaintiff needed restrictions for frequent squatting, crawling, and kneeling because of her hip problems, but that she should be able to sit, stand, and walk. *Id.* Dr. Padamadan also opined that Plaintiff's upper extremity functions for reaching, handling, and fine and gross movements were intact. *Id.*

In November 2004 Dr. Gupta reported that Plaintiff had deep ulcerations on her hands and inside her mouth. (Tr. 361). Dr. Gupta noted that the medications were helping, (Tr. 350, 352, 355, 357, 359, 363, 366), and that Plaintiff was cancelling appointments, but still requesting medication. (Tr. 361, 365). In August 2005, Dr. Gupta noted that Plaintiff was "notorious for missing appointments and ha[d] cancelled her CT 5 times." (Tr. 350). Dr. Gupta advised Plaintiff that she (Dr. Gupta) could not effectively treat her if she would not have the appropriate testing done. *Id.* Plaintiff was discharged for non-compliance. (Tr. 351).

In September 2005 Plaintiff began treating with primary care physician Dr. Hyde who noted that Plaintiff had multiple red macules on her arms. (Tr. 436). Dr. Hyde replaced OxyContin with Darvocet and in December 2005 Plaintiff reported continued problems with her hip. (Tr. 434-35). Dr. Hyde referred Plaintiff to an orthopedist and adjusted her pain medications. *Id.* In March 2006 Dr. Hyde noted that Plaintiff reported that she had a flare-up of her lupus which had lasted

8

about two weeks and that "[s]he had a lot of nausea, vomiting, diarrhea, and painful bruises, mostly on her hands and arms. The cutaneous areas itched first, but now they hurt." (Tr. 433). In May, 2006, Dr. Hyde noted that Plaintiff reported more painful spots, including on her upper arm, making it difficult for her to elevate it and that examination revealed a number of violaceous macules on both arms. (Tr. 432). In June, 2006, Dr. Hyde noted that Plaintiff reported her medication helped and that examination showed a discoid macule on the dorsum of her left hand as well as lesions on her quadricep and the back of her neck. *Id.*

Plaintiff consulted with rheumatologist Dr. Ytterberg in June 2006 who noted that Plaintiff reported that her lesions were initially on her hands, but that they had also involved her arms, face, breast, and on one occasion the back of her neck, the lesions generally last about seven to ten days from beginning to end, and that she continued to have chronic pain in her hip and leg with some left hip pain. . (Tr. 404-06). Dr. Ytterberg also noted that examination revealed healed scarred lesions on the forearms with three on the right breast and one on the left and areas of vitiligo on her forearms, and that there was no vasculitic lesions and no sclerodactyly. *Id.* Dr. Ytterberg reported that Plaintiff's left elbow was tender and slightly swollen, her wrists and small joints of her hand were normal, she had irritability and decreased rotation in her left shoulder but that it maintained range of motion, that she had irritability in her right hip and tenderness in her left knee, and that her wrists, hands, ankles, muscles and gait were normal. *Id.* Dr. Ytterberg opined that lupus should be ruled out as a diagnosis and that while Plaintiff had some features of fibromyalgia, she did not had enough tender points to satisfy that diagnosis. *Id.*

Consulting dermatologist Dr. Nakamura of the Mayo Clinic reported in June 2006 that Plaintiff noted sores and bumps that subsequently turn into a red puffy plaque with lesions

lasting approximately seven to ten days and that when she got the lesions she felt feverish and had more problems with muscle aches and joint pain. (Tr. 402). Dr. Nakamura reported further there Plaintiff had no active lesions, had some large atrophic scars that looked similar to burn scars, some healing erythematosus macules, one on her right arm, one on her posterior neck, and one on her right face, and that Plaintiff had a scattered rash on her cheeks. *Id.* Dr. Nakamura recommended that Plaintiff return when she had a flare-up of active lesions to assist with clinical diagnosis. *Id.*

Dr. Ytterberg reported on June 29, 2006, that Plaintiff's laboratory test results were negative for lupus, x-rays of Plaintiff's right hip suggested loosening in the total hip arthroplasty, left hip x-ray was normal, and that the skin biopsy studies were still pending so a definitive diagnosis could not be made, but that negative serologic tests did not represent lupus. (Tr. 400-01). When Dr. Ytterberg performed a chart review on July 6, 2006, he reviewed the most recent biopsy along with the biopsy results from the Cleveland Clinic, and concluded that the recurrent skin lesions were possibly due to Sweet's syndrome. (Tr. 397-98).

In September, 2006, Dr. Hyde performed a biopsy of a right wrist skin lesion which showed acute and chronic dermatitis with superficial and deep inflammation associated with acanthosis but with a non-specific overall appearance. (Tr. 428-29). Dr. Hyde adjusted Plaintiff's medication, (Tr. 431), and in November and December 2006, Dr. Hyde noted that Plaintiff was doing better on the new medication, but new lesions continued to occur. (Tr. 447-48).

On February 17, 2007, Dr. Hyde reported that Plaintiff was able to lift up to one pound due to pain, stand/walk for up to one-half hour a day and for fifteen minutes without interruption, and sit for up to one hour a day and for thirty minutes without interruption. *Id.* Dr. Hyde also reported that Plaintiff was limited to occasionally performing postural activities, should

avoid hazards and temperature extremes, and that would likely be absent more than three times a month. *Id.* Dr. Hyde noted that Plaintiff had a painful dermatologic/connective-tissue condition, that "[s]he dislikes pain, and can't function when in pain", and that because of Plaintiff's pain and her focus on it, Plaintiff could not perform most of the mental demands of work on a sustained basis. *Id.* Dr. Hyde reported that he based his opinion on the fact that Plaintiff had pain in various parts of her body. *Id.* Dr. Hyde opined that Plaintiff was not able to perform light or sedentary work and that she would be absent from work more than three times a month. *Id.*

Consulting orthopaedic surgeon Dr. Brown reported on February 28, 2007, that an x-ray of Plaintiff's pelvis showed some lucency around the proximal lateral cement of the right hip, but that there did not appear to be any loosening of the stem or cup and that her femoral stem appeared intact. . (Tr. 444). Dr. Brown also reported that Plaintiff's right hip pain sounded more like a snapping iliotibial band and he recommend a bone scan to evaluate the cause, a cortisone injection if the components were well fixed, and physical therapy. *Id.*

In May 2007 consulting surgeon Dr. Berend reported that Plaintiff's x-rays showed good position of the total hip arthroplasty with some ply wear with femur osteolysis zone I, II, IV. (Tr. 450-56). Dr. Berend also reported that Plaintiff was able to climb stairs in a non-reciprocal fashion, sit on an elevated chair for ½ hour, and walk two to three blocks. *Id.* Dr. Berend noted that Plaintiff's range of motion was limited and he identified her primary diagnosis as a failed total hip arthroplasty/mechanical complication. *Id.* Dr. Berend recommended a conservative approach as long as possible, noting she would eventually need a right total hip revision. *Id.*

In November 2007 Dr. Conte reported that Plaintiff had multiple lesions on her bilateral upper arms which were erythematosus, indurated and plaque-like, and there was evidence

of post-inflammatory hyperpigmentation and erythema on her arms. (Tr. 465). Dr. Conte also reported that Plaitniff's presumptive diagnosis was Sweet's syndrome and he recommended that an additional collagen vascular disease should be ruled out. *Id.* A subsequent biopsy report showed findings consistent with Sweet's Syndrome. (Tr. 468).

The medical adviser (MA) testified at the April 9, 2008, hearing that Plaintiff was overweight, depressed, and had arthritis in her right hip with multiple operations, as well as problems with her skin, Plaintiff's arthritis was exclusively on the right side, and that he did not see any evidence that Plaintiff's left hip was affected. (Tr. 517-28). The MA also testified that Sweet's disease was a dermatitis to which some of Plaintiff's symptoms could be attributed, that Plaintiff did not met or equal a Listing, that she was able to lift or carry 10 pounds occasionally and less than ten pounds frequently, she should never climb ladders, ropes, scaffolds, ramps or stairs, and that she should stay away from unprotected heights. *Id.* The MA testified further that Plaintiff should never balance, only occasionally stoop, kneel, crouch and crawl, and that she should not work in a job with high-production quotas, including assembly line work. *Id.* The MA testified that Dr. Hyde, Plaintiff's treating physician, opined that Plaintiff could only lift up to one pound occasionally and one-half pound frequently, but he that he (the MA) thought those statements were extreme and that if Dr. Hyde really believed that Plaintiff were that limited, she would have trouble preparing food and feeding herself and that he (the MA) found that conclusion "unbelievable." *Id.* On cross-examination by Plaintiff's counsel, the MA testified that his concern was why Plaintiff had never seen a dermatologist if her problems were so symptomatic, but the MA accepted that there were records he did not see. *Id.*

Plaintiff alleges in her Statement of Errors that the Commissioner erred by failing to

12

give the opinion of her treating physician Dr. Hyde more weight than that of the non-examining MA and by failing to find that she was credible.   (Doc. 9, 12).

Plaintiff essentially argues in support of her first Error that the MA did not review the entire record before him and therefore his testimony is flawed.  Additionally, Plaintiff argues that Judge Knapp failed to properly weigh the opinion of treating physician Dr. Hyde.

In finding that Plaintiff does not satisfy the Listings and in determining Plaintiff's residual functional capacity, Judge Knapp relied, if not exclusively, in great part, on the MA's testimony and opinion. (Tr. 26-27). However, this Court agrees with Plaintiff that the MA's testimony is flawed because he admittedly did not review the entire record.

As Judge Knapp noted, the MA "questioned the lack of ongoing treatment by a dermatologist, although management with Prednisone was appropriate (with no significant side effects documented). He noted that some of the skin symptoms typically associated with Sweet's Syndrome were not documented in the record."  (Tr. 27).  The MA opined that there was not "intensive enough treatment for the dermatitis for me to comment on the dermatological condition" and  questioned "why has she never seen a dermatologist if the problem is so symptomatic." (Tr. 520-21).  After Plaintiff's counsel pointed out that Dr. Conte was a dermatologist (Tr. 522), the MA noted that Dr. Conte said the rash was confined to the arms, at least on the day Dr. Conte saw her, but the MA again noted, "my major problem is if the rash is so symptomatic, why has she never seen a dermatologist." (Tr. 524). As noted above, the MA testified, "I'll accept that there are records that I have not seen." (Tr. 524).

Contrary to the MA's assumption that Plaintiff has not sought dermatological treatment, as the record reveals, Plaintiff has been treated for her skin condition and its associated

13

pain by her family physician, Dr. Hyde, who subsequently referred Plaintiff to dermatologist, Dr. Conte. Plaintiff initially saw Dr. Conte in August 2001 and over time Dr. Conte noted lesions on Plaintiff's bilateral arms, her left shoulder, and her medial thigh. Plaintiff also sought treatment with Dr. Stevens, a rheumatologist, who treated her for presumptive lupus with Plaquenil, Methotrexate, and a tapering dose of Prednisone. (Tr. 321-321A). Subsequently, Plaintiff was seen at the Mayo Clinic for further evaluation where she was seen by both a rheumatologist, Dr. Ytterberg, and a dermatologist, Dr. Nakamura.

In an attempt to overcome the fact that the MA did not review the entire record before him, Judge Knapp explained that he assigned greater weight to the MA's opinions "as he was able to review the entire, updated medical record, including evidence obtained in conjunction with the hearing, and was able to listen to claimant's testimony at the hearing concerning the effects of her condition." (Tr. 28). However, the fact that the MA admittedly did not review the entire record is fatal to Judge Knapp's attempt.

Failure to consider the record as a whole undermines the Commissioner's conclusion. *Hurst v. Secretary of Health and Human Services,* 753 F.2d 517, 518 (6th Cir. 1985), *citing, Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1973). Because the Commissioner relied on the MA's testimony in determining that Plaintiff is not disabled and because the MA admittedly did not review the entire record, the Commissioner's decision is not supported by substantial evidence on the record as a whole and should be reversed.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to remand the matter for rehearing or to reverse and order benefits granted. The Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or

without remanding the cause for rehearing." 42 U.S.C. §405(g). If a court determines that substantial evidence does not support the Commissioner's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted); *see also, Newkirk v. Shalala,* 25 F.3d 316 (6th Cir. 1994).

The fourth sentence of 42 U.S.C. Sec. 405(g) directs the entry of a final appealable judgment even though that judgment may be accompanied by a remand order. *Sullivan v. Finkelstein,* 496 U.S. 617 (1990). The fourth sentence does not require the district court to choose between entering final judgment and remanding; to the contrary, it specifically provides that a district court may enter judgment "with or without remanding the cause for rehearing." *Id.*

This Court concludes that not all of the essential factual issues have been resolved and that the record does not adequately establish Plaintiff's entitlement to benefits. Specifically, the Court notes that while the Commissioner erred by relying almost exclusively on the MA's opinion when the MA admittedly had not reviewed the entire record, there may be adequate bases for the Commissioner to reject the opinions of Plaintiff's treating sources. That, of course, is a matter for the Commissioner to address.

It is therefore recommended that the Commissioner's decision be reversed. It is also recommended that this matter be remanded to the Commissioner for further administrative proceedings.

May 31, 2011.

*s/ Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).